**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |  |
|---|---|---|
| GREGORY JARELL,<br>        Plaintiff, | :<br>:<br>: | CIVIL ACTION NO.<br>3:12-cv-920 (JCH) |
| v. | :<br>: |  |
| HOSPITAL FOR SPECIAL CARE,<br>        Defendant. | :<br>:<br>:<br>: | SEPTEMBER 25, 2014 |

**RULING RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 67)**

Plaintiff Gregory Jarell brings this action against his former employer, defendant

Hospital for Special Care ("HSC").   The Second Amended Complaint ("Compl.") (Doc.

No. 25) claims that HSC is liable to Jarell for (1) taking racially discriminatory adverse

employment actions against him in violation of Title VII of the Civil Rights Act of 1964

("Title VII"), Pub. L. No. 88-352, 42 U.S.C. § 2000e et seq.; section 1981 of Title 42 of

the United States Code; and the Connecticut Fair Employment Practices Act

("CFEPA"), Conn. Gen. Stat. § 46a-51 et seq.; (2) retaliating against him, because of

protected activities in which he was engaged, in violation of Title VII and section 1981 of

Title 42 of the United States Code; and (3) discriminating against him because of a

disability in violation of the Americans with Disabilities Act of 1990 ("ADA"), Pub. L. No.

101-336, 42 U.S.C. § 12101 et seq.; and the CFEPA.   See Compl.   For the reasons

that follow, the Motion for Summary Judgment is **GRANTED**.

**I.      FACTS**[1]

    A.      Background

    Gregory Jarell is an African American male.   Jarell Affidavit ("Jarell Aff.") (Doc.

No. 75-1) ¶ 1.   He has disabilities—namely, major depression, anxiety, and panic

attacks, Jarell Aff. ¶¶ 78, 79; Fox Letter (Doc. No. 68-1 at 94); Radasch Letter (Doc. No.

68-1 at 95)—and has had them since at least April 13, 2011.   Jarell Aff. ¶ 3.   He is

licensed in the State of Connecticut as a Respiratory Care Practitioner ("respiratory

therapist" or "RT"), and has over two decades of experience working as an RT.   Id. ¶¶

3–5.

    HSC first employed him in 1998.   Defendant's Local Rule 56(a)(1) Statement

("Def.'s L.R. 56(a)(1) Stmt.") (Doc. No. 69) ¶ 4.   HSC has locations in New Britain (the

main campus) and Hartford (a satellite campus).   Excerpts of Deposition of Dieter

Balck ("Balck Depo.") (Doc. No. 76-6) at 13.   Jarell worked at the Hartford campus.

Id. at 13–14.   As of roughly the time HSC terminated Jarell's employment, HSC

employed "approximately 109" respiratory therapists, Defendant's Objections and

Responses to Plaintiff's First Interrogatories ("Def.'s Interrog. Resps.") (Doc. No. 75-2)

at 8, of whom "[a]pproximately sixteen" were African American.   Id. at 5.

    B.      Precipitating patient-care incident

    While Jarell was working a night shift on March 18, 2011, he provided medical

care to a patient.   Def.'s L.R. 56(a)(1) Stmt. ¶ 7; Hosp. for Special Care Memorandum,

---

[1] For the purposes of this Motion for Summary Judgment, the court accepts as true the
undisputed facts in the parties' Local Rule 56(a) Statements and views any disputed facts, as well as the
entire record, in the light most favorable to Jarell, the nonmoving party.

dated April 11, 2011 ("April 11 Memo") at 1.   Another individual also providing care to the same patient during this same shift, nurse Susan Redmond, documented that the patient was having multiple episodes of desaturation (loss of oxygen levels).   Def.'s L.R. 56(a)(1) Stmt. ¶ 8.   She brought this fact to Jarell's attention because he was the specialist RT.   Id.   Jarell responded to the nurse that the desaturation she perceived was an "artifact"—the product of an improper equipment reading.   Id. ¶ 9.   He did not document any efforts that he made to determine whether it was actually artifact.   Id. ¶ 11.   Because, on the morning immediately following Jarell's shift, around 8:00 a.m., the patient underwent respiratory failure, HSC emergently transported the patient to an acute care hospital.   Id. ¶ 13; Balck Depo. at 24; Letter from Maureen Klett, Supervising Nurse Consultant, Connecticut Department of Public Health, to David Crandall, HSC Administrator, dated September 26, 2011 ("DPH Investigation Report") (Doc. No. 68-4 at 13) at 16.

C.   Post-incident investigation, memoranda, and assignment to re-education

In the wake of this emergency transfer event, Jeannie Brewer and Dieter Balck, two "RT Supervisors" at HSC, investigated the care that HSC had provided to the patient.   Def.'s L.R. 56(a)(1) Stmt. ¶ 14.   These two supervisors issued to Jarell a memorandum on Saturday, April 2, 2011 ("April 2 Memo"), Doc. No. 76-3, identifying concerns about the care of the patient on March 18, 2011.   Id. ¶ 15.[2]   They specifically

---

[2] It is not clear whether HSC also issued any similar kind of memorandum or required any "re-education" of anyone else—such as nurse Susan Redmond or anyone else responsible for the patient's health—with respect to this incident.   Compare Golab Affidavit ("Golab Aff.") (Doc. No. 68-1 at 3) ¶ 5 ( "[A]s a result [of the March 18 patient-care issue], a nurse, Susan Redmond (Caucasian) received re-education regarding the expectations for her performance going forward") with Def.'s Interrog. Resps. at 4.   ("[T]he charge nurse involved [during the March 18 patient-care issue], Kerrie Demers, was also required to undergo re-education as a result of the March 18, 2011 incident").   Each of these answers

noted Jarell's failure to document what efforts he made to determine whether the patient's apparent desaturation was an artifact or an accurate representation of the patient's status.   Id.   They provided quotes that they claimed came from HSC's RT job description and HSC's guideline for writing notes in patient charts.   April 2 Memo at 2.

When he was presented with the April 2 Memo, Jarell refused to sign it. Confidential Memorandum, dated March 2, 2011, from Gregg Jarell to Dieter Balck and Jeanie Brewer, ("Rebuttal Memo") (Doc. No. 68-1 at 82) at 3.   Shortly thereafter, he provided a Rebuttal Memo in which he disputed certain representations in the April 2 Memo and argued that he was not in any way at fault or otherwise responsible for the patient's respiratory failure.   Id. at 1–2.   Jarell did not, however, dispute the claim that he omitted to include his judgment that the patient's apparent desaturation was an artifact or an accurate representation of the patient's status.   Nor does the record reflect that he disputed that the particular items mentioned in the April 2 Memo are in fact issued to employees as policies or requirements of HSC ("He was offered RT job description and DAR charting guidelines and declined to take them saying he 'had the policies,'" wrote Dena Eckstrom, an RT supervisor, see Status Memorandum from Gregg Jarell to Judith Trzcinski, dated April 28, 2011 ("Jarell Status Memo") (Doc. No. 76-4 at 4) ¶ 12, although he disputes specifically that he was required to take the steps that the letter indicated he should have taken—namely, to make a note on the chart of his own measurements of the patient's vital statistics and of the method he used to do so.   See Jarell Aff. ¶¶ 4–14.

---

responded to an open-ended question about who besides Jarell may have received a similar memorandum or faced "re-education," but only mentions the one nurse and not the other.

The Rebuttal Memo caused concern to Mary Turley, HSC's Director of Respiratory Care Services, because Jarell's descriptions in his Rebuttal Memo of his course of action on his March 18, 2011 shift "demonstrated questionable decisions by [him] concerning how he monitors oxygen and what he does in cases of suspected artifact."   Def.'s L.R. 56(a)(1) Stmt. ¶ 19; see Letter from Mary Turley to Gregg Jarell, dated July 18, 2011 ("July 18 HSC Letter") (Doc. No. 68-1 at 90) (full name and title of Mary Turley).   As a consequence, Turley issued to Jarell a second memorandum, dated Monday, April 11, 2011 ("April 11 Memo") (Doc. No. 76-3 at 4).   Def.'s L.R. 56(a)(1) Stmt. ¶ 20.   This memo explained her concerns about his practices as a respiratory therapist and explained that, because of these concerns, Jarell would be required to work at HSC's New Britain campus "so that supervisors could closely work with Plaintiff to better evaluate his skills."   Def.'s L.R. 56(a)(1) Stmt. ¶ 20.   In other words, he was to receive "re-education," as the parties both call it.   See id. ¶ 17; Plaintiff's Local Rule 56(a)(2) Statement ("Pl.'s L.R. 56(a)(2) Stmt.") ¶ 3.   Jarell was to report for work at that campus beginning that Saturday, April 16, 2011.   April 11 Memo at 3.

> D.   Report to Connecticut Department of Public Health

Unbeknownst to HSC at the time, Jarell wrote a letter (dated April 11, 2011) to the State of Connecticut's Department of Public Health ("DPH"), which began, "I have been an employee at the Hospital for Special Care (HSC) for 22 years.   I feel strongly about the need to defend my Respiratory Practice regarding a particular incident for the following reasons."   Letter from Gregg Jarell to Supervising Nurse Consultant, State of Connecticut Department of Public Health, dated April 11, 2011 ("DPH Complaint") (Doc.

No. 68-4 at 2) at 1.   It then enumerated Jarell's view of the preceding events and concluded by stating, "I feel strongly that my recommendation was ignored and although other RT's charted that the patient was having increasing difficulty breathing also and that he could not effectively clear his lungs, I am being assigned the blame for the patient being 'Emergently Transferred to an Acute Care Hospital.'"   Id. at 2.   The letter made neither direct reference nor allusion to Jarell's race or his membership in any other class of which Jarell is or purports to be a member, let alone any belief that he was facing unlawful discrimination.   DPH responded with a letter dated April 15, 2011, which began, "Your letter regarding care and services provided by Hospital For Special Care will be investigated by the Facility Licensing & Investigations Section." Letter from Teningh Porcher, Health Program Associate, State of Connecticut Department of Public Health, to Gregg Jarell, dated April 15, 2011 ("DPH Complaint Response") (Doc. No. 76-14 at 1).   Like Jarell's letter, it made no reference or allusion of any kind to race or to any kind of unlawful discrimination.

      E.   <u>Medical issues and leave of absence</u>

      In accordance with the instructions he had received, Jarell reported to the New Britain campus for work on April 16, 2011, "but upon arriving to work [he] called his Supervisor Jeannie Brewer and stated that he was having an anxiety attack and could not work."   Def.'s L.R. 56(a)(1) Stmt. ¶ 25.   He went home.   Excerpts of Deposition of Gregg Jarell ("Jarell Depo.") (Doc. No. 68-1, beginning at 15) at 266 (Doc. No. 68-1 at 42).   He then called in sick to work on April 17 and April 18.   Jarell Status Memo at 1–2.   On the night of April 19, having failed to appear for work, he received a call from (and spoke to) the RT Night Shift Supervisor about why he had missed work that

evening as well.  Id. at 2.   HSC cancelled his Wednesday and Thursday shifts at that

point.  Id.   Jarell then showed up for work on Saturday, did not see his name on a

board that would have indicated he was scheduled to work that day, and called the shift

supervisor to tell her he needed to go home because of an anxiety attack.  Id.   There

appears to have been some confusion about whether Jarell was supposed to work that

day, whether HSC understood him to be taking a leave of absence, or whether, per

HSC policy, Jarell was supposed to provide a doctor's note before returning to work

because he had missed four shifts in a row.  Id.

Jarell never returned to either campus to report for a shift of work for HSC again.

Id.  Instead, after some communication between HSC and Jarell regarding doctor's

notes, HSC recognized Jarell as having taken leave beginning on April 16, 2011, by

right of the Family and Medical Leave Act of 1993, Pub. L. No. 103-3, Connecticut law,

and HSC policy. Letter from Mary Turley, Director of Respiratory Care Services, HSC,

to Gregg Jarell, dated July 18, 2011 ("HSC July 18 Letter") (Doc. No. 68-1 at 90).

     F.     Further accommodation request, DPH investigation, and termination

On July 18, 2011—13 weeks and 2 days after the beginning of Jarell's leave of

absence, HSC sent him a letter stating that, "As of Saturday, July 23, 2011 [i.e.,

fourteen weeks of leave] you will have exhausted all available time under [applicable

laws and HSC policy]."  Id.   It instructed him to contact HSC to state whether he would

be returning to work at the end of these fourteen weeks.  Id.   Jarell responded with a

letter dated July 20, 2011. It stated, "Although my time out on FMLA has reached its

limits - to date I am still under the Medical Care and Treatment of that Doctor. Please

find attached letter(s) from my Doctor's supporting my request for a reasonable

accommodation to remain out of work in order to continue treatment." Letter from Gregg Jarell to Mary Turley, dated July 20, 2011 (Doc. No. 68-1 at 92). Two letters were included, one stating that, "His disability should continue for at least another 14 weeks," Letter from Robert A. Fox, Jr., M.D. (Doc. No. 68-1 at 94), and the other stating that, "In my clinical opinion, he will remain disabled for another 14 weeks," Letter from Peter Radasch, Psy.D. (Doc. No. 68-1 at 95).

HSC responded with a letter dated July 25, 2011, stating, "I am granted [sic] you a two week personal leave of absence effective July 24, 2011, while we consider your request for further accommodation." Letter from Mary Turley to Gregg Jarell, dated July 25, 2011 ("HSC July 25 Letter") (Doc. No. 68-1 at 97). HSC then requested that Jarell meet with its representatives, which he did on August 8, 2011. At that meeting, Jarell confirmed, in response to a query about whether he could return at the end of the leave requested, "It all depends on my medical team."[3] Def.'s L.R. 56(a)(1) Stmt. ¶ 37; Excerpts of Deposition of Judith Trzcinski ("Trzcinski Depo.") (Doc. No. 68-1 at 101) at 32–33 (Doc. No. 68-1 at 103–04).

HSC sent Jarell another letter dated that same day, August 8, 2011. It stated that, "we are extending your personal leave of absence until August 19, 2011 while we evaluate the information you provided to me during our 10:00 a.m. meeting today. We will be back in touch with you no later than August 19, 2011." Letter from Judith

---

[3] During Jarell's deposition, HSC's attorney sought Jarell's clarification about what happened at this meeting by way of asking whether Jarell "indicate[d] at all" that he thought he could return at the end of that period. He confirmed that he responded simply that, "It's up to my medical team." Jarell Depo. at 296 (Doc. No. 68-1 at 51). When asked whether, if he returned, he would do so in a full-time capacity, "[h]e replied, Again, it depends on my medical team." Id. at 298.

Trzcinski to Gregg Jarell, dated August 8, 2011 ("HSC August 8 Letter") (Doc. No. 68-1 at 107).

On August 16, 2011, four months after Jarell's leave of absence began, investigators arrived unannounced at HSC.   DPH Investigation Report at 1.   The documents submitted by the parties reflect that the Connecticut Department of Public Health investigated the care of at least 33 patients over the course of their four-day visit (assuming consecutive numbering of the patients investigated; at least 15 specific patient numbers were mentioned in the papers submitted by the parties for this Motion). Id. at 2–16.   The patient whose care Jarell raised in his letter to DPH is identified as "Patient #5," and Jarell as "RT #2."   Id. at 14–16.   Jarell received a phone call from, and was questioned by, an investigator on August 16, 2011.   Id. at 15; Jarell Aff. ¶ 93. DPH's report also reflects an interview with an "RN #1" on August 25, 2011, and with "RT Supervisor #1" on August 19, 2011, but not with anyone else.   DPH Investigation Report at 15–16.   The relevant actors at HSC deny having had any awareness that Jarell might have been responsible for the visit from DPH.   Affidavit of Mary Turley ("Turley Aff.") (Doc. No. 68-4 at 5) at 1; Excerpts of Deposition of Judith Trzcinski ("Trzcinski Depo.") (Doc. No. 68-1 at 101 and Doc. No. 76-2 at 1) at 50 (Doc. No. 76-2 at 12) and at 54–55 (Doc. No. 68-1 at 105).   Jarell disputes this claimed lack of knowledge.[4]

---

[4] For example, in his Memorandum, Jarell points to HSC's follow-up letter to DPH after the investigation.   Pl.'s Mem. at 23.   In its letter to DPH, HSC noted that the charge nurse involved in the March 18, 2011 patient-care incident underwent re-education.   Letter from John Votto, President/CEO of HSC, to Maureen Klett, Supervising Nurse Consultant, State of Connecticut Department of Public Health, dated November 1, 2011 ("Votto Letter") at 18 (Doc. No. 76-1 at 3).   Meanwhile, Jarell notes, HSC "specifically stated regarding the plaintiff that 'The RT has not returned to work as of the date of this letter', whereas the plaintiffs [sic] employment was terminated almost 2 and half months ago."   Pl.'s Mem. at 23

HSC met with Jarell and sent him a final letter on August 17, 2011.   Jarell Aff. ¶ 94; Letter from Judith Trzcinski to Gregg Jarell, dated August 17, 2011 ("August 17 Termination Letter") (Doc. No. 76-5); Trzcinski Depo. at 50 (Doc. No. 76-2 at 12).   That letter explained, "The Hospital cannot accommodate an additional indeterminate absence of such a minimum duration [14 weeks] without compromising its ability to function. We therefore are terminating your employment effective immediately." August 17 Termination Letter.

## II.   STANDARD OF REVIEW

Granting a motion for summary judgment is proper only if "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." O'Hara v. Nat'l Union Fire Ins. Co., 642 F.3d 110, 116 (2d Cir. 2011).   Thus, the court's

---

(quoting Votto Letter at 18 (Doc. No. 76-1 at 3)).   Jarell appears to infer, from the fact that HSC in this letter avoided stating that it terminated Jarell, that HSC knew Jarell caused the DPH investigation.

More simply, Jarell argues that the defendant "must have known" that the DPH investigator questioned HSC regarding the March 18, 2011 patient-care incident, such that "[a]ny reasonably intelligent person, (here the Management) could deduce that Plaintiff did complain to the DPH and was clearly involved regarding the unannounced investigation by DPH." Pl.'s Mem. at 22.

Although it is not clear whether Jarell attempts to argue this further point, the court notes that the sequence of events surrounding Jarell's firing might suggest an inference that HSC knew that Jarell caused the DPH investigation when it decided to fire him.   Before Jarell's firing, HSC had most recently told Jarell that it would make a decision as to his request for a continued leave of absence by August 19. HSC July 25 Letter.   On August 16, DPH investigators showed up at the hospital, and on that day spoke with Jarell regarding the March 18, 2011 patient-care incident via phone.   DPH Investigation Report at 15; Jarell Aff. ¶ 93.   On August 17, HSC notified Jarell that it was terminating him.   August 17 Termination Letter.

Despite the suspicious timeline here, whether the record indicates that HSC's termination decision might have been driven by the conclusion by some decisionmaker as to Jarell's employment that Jarell caused the DPH investigation is not entirely clear.   The DPH report reflects only one interaction between DPH and anyone else respecting the March 18, 2011 patient-care incident before Jarell's termination: it states that a call occurred between DPH and Jarell on August 16, 2011.   DPH Investigation Report at 15. The report does not make plain whether DPH investigators notified HSC that they wished to speak with Jarell before they did so or whether they contacted Jarell at that time without yet notifying HSC that it was investigating the March 18, 2011 patient-care incident (as DPH could have, given that Jarell provided his contact information when he made the complaint).   DPH Complaint at 1.

The court need not resolve this fact question because, even assuming that Jarell's firing occurred with knowledge (or suspicion) of his having reported HSC to DPH, the court concludes that Jarell's activity was not protected from retaliation.   See infra section III.B.

role in deciding such a motion "is to determine whether genuine issues of material fact exist for trial, not to make findings of fact." Id. In making this determination, the court "must resolve all ambiguities and draw all inferences against the moving party." Garcia v. Hartford Police Dep't, 706 F.3d 120, 127 (2d Cir. 2013).

The moving party bears the burden of establishing the absence of genuine issues of material fact. Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010). If the moving party meets that burden, the party opposing the motion will only prevail if it sets forth "specific facts" that demonstrate the existence of "a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)).

For summary judgment purposes, a genuine issue exists where the evidence is such that a reasonable jury could decide in the non-moving party's favor. See Rivera v. Rochester Genesee Reg'l Transp. Auth., 702 F.3d 685, 693 (2d Cir. 2012); see also Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 104 (2d Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)) (stating that the non-moving party must point to more than a mere "scintilla" of evidence in its favor). "However, reliance upon conclusory statements or mere allegations is not sufficient to defeat a summary judgment motion." Davis v. N.Y., 316 F.3d 93, 100 (2d Cir. 2002).

## III. DISCUSSION

Jarell brings three claims against HSC for race discrimination, one for Title VII retaliation, and one for disability discrimination. He argues that HSC discriminated against him on the basis of his race when it gave him a memorandum on April 2, 2011, and when it gave him a second memo and required him to be "re-educated" for alleged

failure to follow patient-care best practices.   He also argues that his termination from employment a few months later constituted (1) race discrimination, (2) retaliation for activity protected by Title VII and section 1981, and (3) disability discrimination.

The court addresses each claim in turn.   For the reasons that follow, HSC's Motion for Summary Judgment is **GRANTED** as to all claims, and the case is dismissed.

A.      Discrimination on the basis of race (Title VII, section 1981, CFEPA)

Jarell brings claims for race discrimination regarding a series of events between a March 18, 2011 incident related to the care of a patient and his August 17, 2011 termination.   He relies on Title VII, 42 U.S.C. § 1981, and the CFEPA.   Courts have established that these laws proscribing race discrimination all impose the same framework for evaluating claims respecting such forbidden behavior.   See Chukwurah v. Stop & Shop Supermarket Co. LLC., 354 Fed. App'x 492, 494 n.1 (2d Cir. 2009) (Summary Order).   The burden of production is initially on the plaintiff to establish a prima facie case.   See Holcomb v. Iona Coll., 521 F.3d 130, 138 (2d Cir. 2008).   To this end, a plaintiff "must show: (1) that he belonged to a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent."   Id.   A plaintiff may establish the fourth prong of this test by showing that he faced "a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(k)(1)(A)(i).

If the plaintiff makes out a prima facie case, the employer "must, if it is to shift

12

the burden back to plaintiff, produce evidence that [the plaintiff] was terminated 'for a legitimate, nondiscriminatory reason.'"   Holcomb, 521 F.3d at 140 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981).

Finally, if the employer meets this burden of production, the plaintiff "may no longer rely on . . . presumption[s]."   Id. (citing Burdine, 450 U.S. at 255–56).   He must then "raise[ ] sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that the decision to fire him [or take other adverse action] was based, at least in part, on the fact that [he] was black."   Id.

1.   The April 2 Memo

Jarell first argues that the April 2 Memo on its own was an adverse employment action.   The court disagrees.   "It hardly needs saying that a criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action."   Weeks v. N.Y. State Div. of Parole, 273 F.3d 76, 86 (2d Cir. 2001), abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002).   Whether or not it is called "disciplinary," as one HSC employee called this one, a memorandum that is merely a "written warning" of a violation of the employer's policy "do[es] not constitute 'materially adverse' action[ ]" for purposes of establishing a prima facie race discrimination case. Chang v. Safe Horizons, 254 Fed. App'x 838, 839 (2d Cir. 2007) (summary order).

The April 2 Memo outlined two kinds of concerns that Jarell's HSC supervisors had with his actions: (1) his "failure to provide appropriate documentation . . . regarding patient care," and (2) "issues" with his "professional behavior toward Respiratory Care Supervisors."   April 2 Memo at 1.   On the first point, the letter explained, inter alia, that

from his supervisors' investigation with respect to the patient who later had to be transferred to another hospital in an emergency situation, Jarell failed to take certain important actions.   Id. at 1–2.   On the one hand, he may have failed to ensure that the patient received certain interventions to prevent respiratory failure that eventually happened.   Id.   This possibility was reflected in certain readings by a nurse attending to the same patient; those readings suggested low blood-oxygen levels, apparently a sign that intervention was needed.   Id.   On the other hand, if Jarell did take sufficient actions to ensure that no settled signals of such failure were apparent (he claimed to have done alternative diagnostics because he believed the first readings were inaccurate), or even if he just believed that the readings were inaccurate and had not double-checked with new testing, he did not document either response.   Id.   The supervisors asserted that hospital policy required such documentation and quoted from what appears to be some kind of policy statement for HSC.   Id. at 2.   This second possibility was reflected by the lack of any notes in the patient's charts indicating what diagnostics Jarell had done.   Id. at 1–2.   The memo also noted that Jarell had received a memo about two months earlier which, like the present one, "counseled [him] on failure to provide proper documentation which include[s] review of the . . . charting guidelines."   Id. at 2.

On the professional behavior issue, the supervisors noted that, in the course of their investigation after the emergent transfer of the patient at issue, Jarell's "first response [to their questions about his failure to document events on the patient's charts] was 'Just put it in writing cause it sounds like you already have.'"   Id. at 1.   It also noted that, in response to another question, Jarell stated, "I am not going to

14

answer that question, like I said before, refer to my notes." Id. at 2.   The letter

concluded by stating, "It is important that you understand the seriousness of your

actions and our concerns that you appeared to be less than receptive to our

constructive feedback in this matter." Id. at 2.

For any of its criticisms, this memo only warned Jarell that continued

noncompliance with HSC policies would have future adverse consequences. Id. at 2.

It did not itself establish any change in the conditions of Jarell's employment.   The

court thus holds as a matter of law that HSC's presenting Jarell with this letter—which

the parties agree merely set forth expectations for Jarell's performance going forward

and in no way altered any of his working conditions—does not qualify as an adverse

employment action.   Thus, Jarell cannot make out a prima facie case of race

discrimination in employment based on HSC's giving him this memo.   Def.'s L.R.

56(a)(1) Stmt. ¶ 16.

> 2.      The April 11 Memo and re-education requirement

Jarell also argues that the April 11 Memo given to him by HSC and the decision

to require re-education constituted adverse employment action(s).   Plaintiff's

Memorandum in Opposition to Summary Judgment ("Pl.'s Mem.") (Doc. No. 75) at

9–11.

Unlike the April 2 Memo, the court concludes that these actions constituted

adverse employment action.   The same reasoning and conclusion as applied to the

April 2 Memo also apply to the April 11 Memo insofar as on its own it did not change

the terms or conditions of Jarell's employment. See April 11 Memo at 1–2.   However,

the second half of the memo describes a new (albeit supposedly temporary) regime for

Jarell's conditions of employment.   He now had to report to work at an entirely different hospital campus where HSC also operated so that he could be more closely supervised.   See id. at 2–3.   True, Jarell was to "maintain[ ] the same hours and [was] not [to] lose any pay or benefits," Def.'s L.R. 56(a)(1) Stmt. ¶ 23, but the circumstances in which he would be performing his duties and the way he would perform them changed for the worse, because he became subject to the kind of treatment afforded to trainee RTs.   See Jarell Aff. (Doc. No. 75-1) ¶ 77.   Accordingly, the court is satisfied that the joint fact of HSC's issuing the April 11 Memo and its requirement that Jarell be re-educated at HSC's New Britain campus could reasonably be found by a jury to be an "adverse employment action."

Jarell proceeds with his attempt to establish a prima facie case of race discrimination on this basis by arguing that HSC imposed this adverse employment action on him because of his race.   Pl.'s Mem. at 11–17.   "A plaintiff may raise such an inference by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group."   Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000).   A plaintiff who faced an adverse employment action can show that similarly situated employees were treated more favorably only by establishing "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases," which includes "an examination of the context and surrounding circumstances in which th[e employees' allegedly precipitating] acts [took place]."   Graham, 230 F.3d at 40.

Jarell's choice to make certain statements in his Rebuttal Memo appears to have been the catalyst for HSC's adverse action against him.   Specifically, his memo

disputes the factual bases for parts of the April 2 Memo, disclaims any wrongdoing, and claims that HSC was on a "Witch Hunt."   Rebuttal Memo at 1; Trzcinski Depo. (Doc. No. 68-1 at 101) at 2 (stating that "insubordination" and "patient care" were the issues that prompted the reassignment).

Jarell fails to present any evidence about similarly situated employees to whom HSC gave comparably favorable treatment under similar factual circumstances.   He alleges with bare assertions in his Affidavit that other employees who took care of the same patient during the shift prior to his, the same shift as his, and the subsequent shift committed violations of HSC policies similar to Jarell's alleged violation but did not face similar consequences.[5]   Pl.'s Mem. at 11–14; Jarell Aff. ¶¶ 10, 29, 38–39, 51–66. Even assuming that these allegations were true and that Jarell provides sufficient evidence to support these allegations, these individuals are not similarly situated. Jarell does not show that any of these employees received a memorandum describing a failure to follow HSC policies (similar to the April 2 Memo) and then responded by disclaiming responsibility, as Jarell did.   Nor does he point to anyone who HSC stated had any issues with maintaining a professional level of conduct with other employees or supervisors (or who actually did have such issues, regardless of what HSC stated), and who were not then required to undergo re-education.

The court thus concludes that this case is much like Cruz v. Coach Stores, Inc., 202 F.3d 560 (2d Cir. 2000), in which an employee claimed that her termination constituted race discrimination.   The plaintiff in that case argued that other similarly

---

[5]  It appears that the patient had one main respiratory therapist per shift.   See Jarell Aff. ¶¶ 38–40 (referring to "the RCP [respiratory care practitioner]" for each relevant shift).

situated employees, who were not members of her protected class, had violated the same rule against "physical or verbal assaults while on company premises" that her employer said was the reason for the adverse action it took against her, yet they had been treated favorably compared to her.   Id. at 567–68.   The Second Circuit concluded that Cruz had not produced enough evidence for a jury to conclude that similarly situated employees had been treated differently because the plaintiff had "engaged in a physical fight, while the other employees' behavior—offensive though it may have been—involved words only."   Id. at 568.

The court thus concludes that Jarell likewise has not offered evidence of similarly situated individuals who are not members of his protected class and who, in contrast to him, received comparatively favorable treatment such that a reasonable jury could infer a racially discriminatory intent on the part of HSC.   Jarell fails to come forward with evidence that HSC treated him differently from similarly situated employees and offers no direct evidence of race discrimination.   The court thus grants the defendant summary judgment on this claim as well.

### 3.    The termination

The parties do not question that termination is an adverse employment action. Jarell's argument as to his termination rests on roughly the same kinds of allegations as in the race discrimination, re-education-based claim just discussed: Jarell fails to come forward with evidence to create a material issue of fact as to his prima facie burden of showing "that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent."   Holcomb, 521 F.3d at 138.   Even were Jarell to meet this burden, HSC provides a "legitimate, nondiscriminatory reason" for his firing.

Id. at 140.

When HSC required Jarell to be re-educated by working at a different campus where more supervision was available, Jarell suffered from an anxiety attack and ultimately took sick leave.   He also sought the treatment of a psychologist and a psychiatrist.   He ultimately took 14 weeks of leave pursuant to HSC's policy and/or interpretation of state and federal medical-leave law.   HSC July 18 Letter.   He then asked for additional leave, and HSC tentatively allowed him this leave while it considered his request; it promised to respond by August 19, 2011.   HSC July 25 Letter.   Within that timeframe (and shortly before the expiration of 18 total weeks of leave), HSC claims to have determined that it could not continue to offer Jarell further leave—especially if it were of an indefinite length, as his request appeared to HSC to be—so it terminated his employment.   August 17 Termination Letter.

Jarell does not offer "sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that the decision to fire him was based, at least in part, on the fact that [he] was black."   Holcomb, 521 F.3d at 140.   Indeed, he offers nothing more than an occasional bare conclusory assertion of racial prejudice on the part of his supervisors or other employees.   Jarell Aff. ¶¶ 10, 20, 29, 60.   At the deposition of one HSC employee, his attorney vainly asked a series of questions that appear to have been intended to tease out evidence of such prejudice.[6]   Nor does

_____

[6] In the precise words of the plaintiff's Local Rule 56(a)(2) Statement, "Mr Dieter Balck personal memorandums used and saved a record for almost all conversations he had with the Plaintiff. (Ex. 7, Dieter Depo Trans. Pgs 39-54)," and "Mr Dieter Balck personal memorandums against the Plaintiff provide an inference of racial animus. (Ex 14. Dieter Balck: Record of some of the interactions with plaintiff whereas Mr Balck was not the Plaintiffs immediate supervisor.)."   Pl.s' L.R. 56(a)(2) Stmt. ¶¶ 6, 7. The court has diligently reviewed the portions of the record to which these conclusions refer (along with the rest of the record) and concludes that Jarell has presented no evidence from which a reasonable jury

Jarell offer evidence about other employees who were not black having taken similar

amounts of leave and then having similar requests for extensions of their leave granted.

Indeed, he comes forward with no evidence about other employees' leave requests.

He offers no evidence that HSC's action in terminating him was because of his race.

Because Jarell has failed to offer evidence that creates a material issue of fact on this

termination race discrimination claim, the court grants summary judgment to HSC as to

this claim as well.

> B.     Retaliation for protected activity (Title VII, section 1981)

Jarell argues that HSC terminated him with a motive that was retaliatory in a way

that violates Title VII and section 1981 of Title 42 of the United States Code. HSC

argues that Jarell's retaliation claim fails because he has not brought forward evidence

that he was engaged in protected activity.

"The elements of a claim of retaliation under these laws are: (1) that plaintiff

engaged in activity protected by the law, (2) that the employer was aware of the

protected activity, (3) that the employer took adverse action against the plaintiff, and (4)

that a causal connection exists between the protected activity and the adverse action."

Malacarne v. City Univ. of N.Y., 289 Fed. App'x 446, 447 (2d Cir. 2008) (citing Kessler

v. Westchester Cnty. Dep't of Soc. Svcs., 461 F.3d 199, 205–06 (2d Cir. 2006)).   The

activities protected under these statutes are attempts "to secure . . . rights" guaranteed

by the statutes.   CBOCS West, Inc. v. Humphries, 553 U.S. 442, 463 (2008).   As the

Second Circuit put it recently:

---

could infer racial animus.

An employee's complaint may qualify as protected activity, satisfying the first element of this test, so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law. And not just any law—the plaintiff is required to have had a good faith, reasonable belief that [he] was opposing an employment practice made unlawful by Title VII.

Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C., 716 F.3d 10, 14 (2d Cir. 2013) (quoting Gregory v. Daly, 243 F.3d 687, 701 (2d Cir. 2001) and McMenemy v. City of Rochester, 241 F.3d 279, 285 (2d Cir. 2001)) (citations and quotation marks omitted); see also Wimmer v. Suffolk Cnty. Police Dept., 176 F.3d 125, 134–35 (2d Cir. 1999).

The activity that Jarell alleges was protected by Title VII and section 1981 was filing a complaint with the Connecticut Department of Public Health.   However, he has provided no evidence that the complaint was "motivated by a 'good faith, reasonable belief that [some] practice [of the employer] was unlawful."   Kelly, 716 F.3d at 14. The complaint to the Department of Public Health only addresses patient-care issues, the very subject matter within the jurisdiction of that agency, as opposed to matters of employment discrimination.   DPH Complaint.   It makes no reference to race, or to any protected class at all.   The court doubts that the letter could lead any reasonable jury to conclude that the writer was concerned about anything more than being wrongfully blamed for actions that he thought were not his fault.[7]   At most, given some of the bare

---

[7] As the letter states in its introduction, "I feel strongly about the need to defend my Respiratory Practice regarding a particular incident," and in its conclusion, "I feel strongly that my recommendation was ignored and although other RT's charted that the patient was having increasing difficulty breathing also and that he could not effectively clear his lungs, I am being assigned the blame for the patient being 'Emergently Transferred to an Acute Care Hospital.'"   DPH Complaint at 1–2.   Such characterizations may indicate that Jarell was concerned about being blamed wrongfully, but provide no basis from which to conclude that this letter is a complaint about race discrimination protected from retaliatory action under Title VII.

assertions of race discrimination in Jarell's Affidavit, the record might suggest that Jarell desired to make the complaint to Connecticut's DPH about the quality of HSC's patient care because he resented HSC for what he perceived as race discrimination, but not that he was opposing race discrimination with this complaint.   Jarell Aff. ¶¶ 85–87.

Jarell also belatedly asserts in his summary judgment opposition that his "rebuttal to the disciplinary memo"—specifically, "stat[ing] that [HSC was] on a 'withchunt' [sic] and clearly implying that he is being targeted for impermissible reasons," Pl.'s Mem. at 22—constitutes protected activity.   The several-page memo makes absolutely no reference of any kind to race discrimination.   It only alleges that certain behavior "indicated that you [HSC/its agents] were on a 'Witch Hunt.'"   Rebuttal Memo at 1.   Because this statement, let alone the record before the court, gives no indication that Jarell was opposing any activity made illegal by Title VII or section 1981, the court concludes that the statement is not protected activity.   Therefore, the court grants summary judgment as to Jarell's Title VII retaliation claim.

C.   Failure to accommodate/wrongful discharge (ADA and CFEPA)

Jarell brings a disability discrimination claim against HSC based, again, on his termination from employment.   See Complaint at 7–10; 42 U.S.C. §§ 12112(a), 12112(b)(5), 12117(a); Conn. Gen. Stat. § 46a–60(a)(1).   A plaintiff bringing a claim for failure to accommodate (or for the wrongful discharge subspecies), whether under the ADA or the CFEPA, "has the burden of making out a prima facie case, which includes the following elements: '1) he was an 'individual who has a disability' within the meaning of the statute; 2) the employer had notice of his disability; 3) he could perform the essential functions of the job with reasonable accommodation; and 4) the employer

22

refused to make such accommodation.'"   DeRosa v. Nat'l Envelope Corp., 595 F.3d

99, 102 (2d Cir. 2010) (quoting Parker v. Columbia Pictures Indus., 204 F.3d 326, 332

(2d Cir. 2000)); see also Curry v. Allan S. Goodman, Inc., 286 Conn. 390, 415 (2008)

(relying upon federal case law describing ADA elements to evaluate CFEPA

disability-discrimination claim).   Some cases have also noted what is, in effect, a fifth

element: the employer must be one to which the ADA applies.   See, e.g., McMillan v.

City of N.Y., 711 F.3d 120, 126 (2d Cir. 2013).   "If the plaintiff succeeds in establishing

a prima facie case of disability discrimination, the burden shifts to the employer to

demonstrate that the employee's proposed accommodation would have resulted in

undue hardship."   Parker, 204 F.3d at 332.

HSC contends that Jarell has not met his burden of producing enough evidence

such that "a reasonable juror could find he was in fact capable of performing the

essential functions of his job with a reasonable accommodation."[8]   Id. at 334.

Whether a requested accommodation is reasonable is often a difficult question.

However, "[t]he duty to make reasonable accommodations does not, of course, require

an employer to hold [a disabled] employee's position open indefinitely while the

employee attempts to recover."   Id. at 338; see also Mitchell v. Washingtonville Cent.

Sch. Dist., 190 F.3d 1, 9 (2d Cir. 1999).

The court concludes that there is no genuine issue as to what accommodation

Jarell requested: it was an indefinite leave of absence to regain his ability to perform his

---

[8] HSC challenges only the third element of Jarell's disability-discrimination claim.   It does not dispute that the other four elements of the failure-to-accommodate prima facie case are satisfied: (1) that Jarell has a qualifying disability, (2) that HSC had notice of his disability, (4) that, assuming that there was some accommodation that would have been reasonable, HSC refused to make it, or (5) that HSC is an

basic responsibilities as an RT.   Suggesting otherwise in his memorandum, Jarell rests

heavily on the fact that, between the two doctor's letters that he submitted to HSC,

although one of them said he needed "at least fourteen weeks," the other simply said

"fourteen weeks" without any qualifier.   See Pl.'s Mem. at 19; Letter from Robert A.

Fox, Jr., M.D. (Doc. No. 68-1 at 94); Letter from Peter Radasch, Psy.D. (Doc. No. 68-1

at 95).   In light of the record as a whole—specifically, Jarell's later repudiation of this

one piece of evidence, denying any certainty about the length of the absence he

sought—no more than (at most) a mere "scintilla of evidence" in the record taken as a

whole supports Jarell's contention on this issue, so no reasonable juror could conclude

that Jarell requested leave for a definite period of time.   See Anderson, 477 U.S. at

252.   Jarell does not dispute that, in response to this request that he made for

additional leave, HSC asked him to meet with representatives from HSC's Human

Resources Department, nor that at his meeting with them, he only stated "[i]t all

depends on my medical team."   Def.'s L.R. 56(a)(1) Stmt. ¶¶ 33–36; Trzcinski Depo at

32–33 (Doc. No. 68-1 at 103–04).   And he admits that, despite HSC's efforts to ask

him follow-up questions to better understand when he might be able to return to work,

Jarell was very short in his answers and kept responding that it "depends on my

medical team."   Def.'s L.R. 56(a)(1) Stmt. ¶ 37; Pl.'s L.R. 56(a)(2) Stmt. ¶ 37 ("Admit.").

Clarifying things further at Jarell's deposition, HSC's attorney asked whether Jarell

"indicate[d] at all" that he thought he could return at the end of the second

fourteen-week period.   He confirmed that he responded simply that, "It's up to my

medical team."   Jarell Depo. at 298 (Doc. No. 68-1 at 53).   On these facts, no

---

employer covered by the relevant disability laws.

reasonable jury could conclude that Jarell sought a leave of absence for a definite length.

Nor is Jarell's position like that of the plaintiff in <u>Graves v. Finch Pruyn & Co., Inc.</u>, in which the court concluded that a reasonable jury could have found that the plaintiff was merely asking for a "couple of weeks," although he was less than clear about exactly how long things would take.   457 F.3d 181, 186–87 (2d Cir. 2006). There, after the plaintiff's paid disability leave under the company's policy had expired, he explicitly said that he expected it to take approximately two weeks to consult with specialists about his chances of rehabilitation—and, even if he was not entirely sure that he would need <u>only</u> that long, the time he requested was a mere couple of weeks—not the at-least additional three months that Jarell sought here.   <u>See id.</u> at 185.

In concluding that the record can only support the finding that Jarell requested an <u>indefinite</u> leave, the court is mindful that <u>Mitchell</u> and <u>Graves</u> suggest that several factors may play into whether a request is for a definite amount of time: (1) the amount of the time actually requested, irrespective of definiteness, (2) the definiteness of the length of time requested, and (3) other features of the request, including whether it follows other requests, and the circumstances of any prior leave taken or accommodations provided.   Here, the court notes (1) that the request was for roughly three months (and not, say, one or two weeks); (2) that the length of his absence that Jarell was requesting was entirely uncertain, determinable only by his doctors at a later date; and (3) that this request for leave followed a prior, lengthy one.

Jarell briefly argues that HSC failed to engage in an interactive process to

determine the appropriateness of a disability accommodation for Jarell.   See Pl's.
Mem. at 20.   In determining whether an accommodation is reasonable, an employer
may not rest on a negative view of the accommodation requested by an employee.
Parker, 204 F.3d at 338 (noting that, while an employer need not "investigate every
aspect of an employee's condition before terminating him based on his inability to
work," it must at least "investigate [a] request and determine its feasibility").   However,
Jarell has not established any genuine issue of fact as to whether HSC fulfilled this
responsibility.   As the court noted supra at 24–25, he admits that HSC invited him to a
meeting, that he attended, that he spoke with HSC representatives, and that, when
HSC inquired further to understand the nature of the leave that Jarell sought, Jarell
simply gave the repeated, curt answer that, "it depends on my medical team."   Def.'s
L.R. 56(a)(1) Stmt. ¶ 37.   Indeed, he offers no evidence to support his claim that HSC's
attempt to accommodate him was inadequate.   Given that Jarell admits that HSC set
up a meeting with him and specifically inquired about the accommodation that he
requested, and that he did not elaborate at all upon his request by way of helping HSC
determine whether it could accommodate him, he cannot now defeat a summary
judgment motion by baldly asserting that HSC has failed to engage in the interactive
process.

Finally, Jarell briefly objects that he "was not given any opportunity to discuss or
explore any other opportunity that he could enter given his educational background and
experience in hospital administration."   Pl.'s Mem. at 20.   He cites no case law in
support of this proposition and it is, indeed, unsupported in the law.   See Bates v. Long
Island R. Co., 997 F.2d 1028, 1035 (2d Cir. 1993) (noting that disability-accommodation

law does not, as a rule, "require an employer to reassign a disabled employee to a different position").

For the foregoing reasons, HSC's Motion is granted as to Jarell's failure-to-accommodate claim.

## IV.    CONCLUSION

The defendant's Motion for Summary Judgment (Doc. No. 67) is hereby **GRANTED**.   Judgment shall enter for the defendant.   The Clerk is directed to close the case.


**SO ORDERED.**

Dated at New Haven, Connecticut this 25th day of September 2014.



/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge